## BOARD OF EDUCATION OF MONROE COUNTY *et al.*
### *v.* THURMOND *et al.*

1. The Board of Education of Monroe County having lawfully incurred debts for money loaned to pay teachers and operate the public schools of the county, and such debts having accumulated from year to year until the fall of 1924, it was in the power of that board to repay such debts from any funds that could lawfully be applied to such purpose, including funds derived from the levy of a local tax in the fall of 1924 for operating the schools.

· 2. The Board of Education of Monroe County, having power to define and regulate the length of the public-school terms, has also power, after having specified the duration of a particular term, to pass a resolution, after expiration of six months of such term, closing the term prior to the time originally provided for expiration of the term.

3. The board of commissioners of Monroe County has no power so to contract with the county board of education as to bind the board of education to operate the schools for any particular time, and the board of education will not be bound by any promise to the board of county commissioners in regard to the length of time it will operate the public schools at any term.

---

Schools and School Districts, 35 Cyc. p. 1045, n. 42, 47; p. 1124, n. 19.

4. On the facts of this case, the board of education did not abuse its discretion on March 13, 1925, in closing the term which commenced in September, 1924, and in applying the funds derived from local taxation levied in the fall of 1924 to payment of the debts accumulated during previous years for money borrowed to pay teachers and operate the schools.

5. The judge erred in granting a mandamus absolute.

No. 4994. MARCH 12, 1926.

Mandamus. Before Judge Searcy. Monroe superior court. June 5, 1925.

*Willingham & Willingham, A. M. Zellner, Reagan & Reagan,* and *Hall, Grice & Bloch,* for plaintiffs in error.

*Cleveland & Goodrich,* contra.

ATKINSON, J. The Board of Education of Monroe County in past years borrowed money from the Citizens Bank of Forsyth, for the purpose of paying teachers and operating the public schools in the county. In this manner debts were accumulated. At the beginning of September, 1924, the schools were opened while the accumulated debts were outstanding, and in November the bank loaned an additional sum of $25,200, a part of which was applied to payment of interest on the accumulated debt and the balance to payment of the teachers. The sum thus applied to the payment of teachers was insufficient to pay them to the end of the year; and $3000, derived from discount in another bank of warrants issued to the board of education from the State public school fund, was used to finish paying what was due the teachers in the year 1924. Other sums derived from the discount of the above-mentioned State warrants were used to pay the teachers and operate the schools in January and February, 1925. The board of education in obtaining loans from the Citizens Bank of Forsyth did so on agreement to turn over all revenues derivable from local taxation and from the State for payment on the existing indebtedness and such future advances as should be made by the bank for payment of teachers and operating the schools. In 1925 the bank became dissatisfied with the attitude of the county school superintendent in failing to turn over warrants received from the State, and in March refused to make any other advances or loans for the purposes above mentioned. In these circumstances the board of education on March 13, 1925, after the term of school commencing in September had been conducted for more than six months, passed a resolution closing the schools for the

term. Several days prior to closing the schools the board had passed other resolutions directing application of all revenues derivable from local taxation and from the State, during the years 1925 and 1926, to payment of the existing indebtedness to the Citizens Bank of Forsyth, in order that such indebtedness might be reduced to such an extent as that the bank would make further advancements necessary to pay teachers and operate the schools. Among the resolutions was one directing the tax-collector of the county to pay all sums collected from local taxation directly to the bank, to be credited on such existing indebtedness. At the time of closing the schools and passing such resolutions there was sufficient money in the tax-collector's hands and in the process of collection from the local tax levy of 1924 to pay the teachers and operate the schools for a full term of nine months from September 1, 1924, if such funds should be applied to such purpose instead of applying them towards reduction of the accumulated indebtedness to the Citizens Bank of Forsyth. Prior to 1924 the board of county commissioners had been levying a local tax of five mills for support of the schools; but in the fall of 1924 the board of education requested the board of county commissioners to levy an additional tax of three mills in order that the schools might be operated for a full term of nine months. Upon such application the board of county commissioners levied a local tax of eight mills, which constituted the local tax that the tax-collector was engaged in collecting as above indicated. The county school superintendent and certain citizens and taxpayers and patrons of the schools brought suit against the county board of education, the tax-collector, and the Citizens Bank of Forsyth, for the writ of mandamus to compel the board of education to rescind the resolutions above indicated, and to cause the money being collected by the tax-collector from local taxation to be paid to the treasurer of the board of education, for the purpose of paying the teachers and operating the schools for the full term of nine months from September, 1924.

The defendants filed separate answers, which, among other things, alleged the right of the board of education to apply the revenues of the board to payment of the accumulated indebtedness to the bank which arose prior to the year 1925; also that it was necessary to apply such revenues to reduction of the accumulated

indebtedness to the bank in order to finance the schools; also that it was in the power of the board of education to close the schools before the expiration of nine months, and that in the circumstances there was no abuse of discretion in applying the revenues to the past-due indebtedness and in closing the schools. The answers also denied the making and validity of the alleged contract with the board of county commissioners to operate the schools for nine months. At the first term of the court the case was submitted by consent to the judge for decision on all questions of law and fact without a jury. The judge rendered a decision holding, in effect, that it was unlawful for the board of education to apply the funds arising from local taxation levied in 1924 on payment of the debts to the bank which had accumulated prior to that year; that a certain amount remained due to the bank for money advanced to pay the teachers and operating the schools during the term commencing September 1, 1924; that the funds now in hand derived from and funds to be collected from the local tax levy of 1924 be distributed pro rata towards payment of such amount so found to be due the bank for money advanced in 1924 and the amount necessary to pay the teachers for the balance of the full term of nine months from September 1, 1924, and if there should be an excess it should be applied to any lawful school purpose or obligation; that so much of the resolution of the board of education as seeks to dispose of school funds for 1925-1926 by transferring the same to the Citizens Bank of Forsyth as a credit on or in payment of debts due to it is contrary to law and void, and the same is annulled; that the resolution of the board of education closing the schools was void as in violation of the agreement of the board of education with the board of county commissioners to operate the schools for nine months; and it was ordered that "the mandamus nisi is made absolute as to the matters herein ruled." The board of education and the Citizens Bank of Forsyth excepted. It appeared on the trial that after the passage of the resolutions by the board of education, closing the schools for the term, the superintendent of schools, without authority from the board of education, continued to operate the schools without paying the teachers. It was alleged in the petition that the board of education had made contracts employing the teachers for a full term of nine months, but this was denied in the answers filed by

the board of education, and there was no evidence to show such contracts.

1. The petition in this case does not allege that any of the money borrowed from the bank was illegally borrowed, and the court did not decide that any of the money was illegally borrowed. In these circumstances, for all purposes of this case, the unpaid balance of the money borrowed from the bank will be deemed to be a valid debt of the board of education. A fundamental contention made by the petitioners is that the board of education could not apply the funds in the hands of the tax-collector, collected and to be collected under the levy of the local tax in the fall of 1924, to payment of the accumulated indebtedness to the bank for moneys previously loaned that did not go to pay the teachers and operate the schools during the calendar year 1925.. The Code of School Laws (Acts 1919, p. 288) contains the following:

"Sec. 95. . . The county boards of education of the several counties of this State shall have the power and authority, whenever they deem it necessary, to borrow sufficient amounts of money, and no more, to pay for the operation of the public schools of their counties.; provided, that no board of education shall have authority under this law to borrow a sum of money greater in the aggregate than the sum to which the county may be entitled from the public-school fund.

"Sec. 96. . . In order for any board of education to borrow money for the purposes hereinbefore stated, there shall be passed by said board a resolution authorizing said money to be borrowed, in which resolution it shall be stated the amount of money to be borrowed, the length of time the same is to be used, the rate of interest to be paid, and for what purpose borrowed and from whom the same is to be borrowed, which resolution shall be by the county school superintendent recorded on the minutes of the meetings of said board of education.

"Sec. 97. . . No money shall be borrowed for any longer time than is necessary, and the same shall be paid back out of any funds coming into the hands of the county school superintendent that can be legally applied to the payment of the same.

"Sec. 98. . . Said board of education so borrowing money shall borrow the same at as low a rate of interest as possible, and

they are authorized to pay the interest on said money out of the public-school fund for said county.

"Sec. 99. . . At the opening term of the superior court of each county in this State where money has been borrowed by the board of education under the provisions of this law, the county school superintendent shall include in his report to the grand jury the amount of money so borrowed during the preceding year, from whom borrowed, the rate of interest paid, the date or dates the same was borrowed, and when paid back.

"Sec. 100. . . After the resolution aforesaid has been passed by any board of education, the president of the board of education, together with the county school superintendent, shall have the right to execute a note or notes in the name of the board of education of said county, for any money that is authorized to be borrowed under the resolution passed by said board of education.

"Sec. 101. When any money shall be borrowed under the provisions of this law, the same shall be paid over to the county school superintendent and become a part of the public-school fund of said county, and the same shall be by the county school superintendent paid out to the teachers of said county; and the county school superintendent shall be responsible for any money borrowed under the authority of this law and paid into his hands, in the same way and to the same extent that he is responsible for any other public-school funds coming into his hands.

"Sec. 102. . . It shall be unlawful for any board of education to make any contract involving the expenditure of funds in excess of the total appropriation for the current fiscal year. Any indebtedness created, contract made, or order or draft issued in violation thereof shall be void.

"Sec. 112. . . As soon as the county board shall communicate satisfactory evidence to the State school superintendent that arrangements have been made, by taxation or otherwise, for continuing the common schools, free to all, for at least six months in the year, throughout the entire county, said county shall be deemed and held entitled to draw her proportionate part of the State funds.

"Sec. 113. . . Whenever a board of education shall fail in any year to make arrangements to put schools in operation, it shall forfeit all rights to participation in the school funds of that

year, unless the failure to arrange for such schools was from providential cause, or other good and sufficient reason to be judged of by the State board of education."

These laws contemplate necessity to anticipate revenues provided by law for operating the public schools before such funds come into the hands of the boards of education, and authorize boards of education to borrow money for the purpose of paying teachers and operating public schools. Ordinarily the power to borrow money necessarily implies power to repay the debt. The above-quoted laws, while authorizing the borrowing of money for the purposes above indicated and the manner in which contracts for the borrowing of money shall be made, do not limit the power of the board of education in the matter of repayment. On the contrary, under section 97 the money should not be borrowed "for any longer time than is necessary," and it should be "paid back out of any funds coming into the hands of the county school superintendent that can be legally applied to the payment of the same." Assuming that a debt had been lawfully created for the loan of money for purposes as above indicated, the board of education is bound to pay it back out of any funds that can be legally applied to such payments. Funds that can be legally applied to such payments are such as come into the hands of the board of education for the purpose of paying teachers and operating the public schools. Repayment of money borrowed for the purposes should be made out of the revenues appropriated to the schools for the year in which the borrowed money is to be used, but the statute does not limit repayment to the funds so appropriated. It recognizes the duty of the board of education to repay the money out of any funds which may be lawfully applied to such purposes. Money appropriated for the public schools of the county is lawfully applied when applied to repayment of money borrowed to pay teachers and operate the schools. The proper construction of the statute is that it authorized repayment out of any funds that should be appropriated to the board of education at any time for the payment of teachers and operating the schools. The legislative intent was not to create a device, but to make a wise provision whereby the schools could attain the advantages of borrowed money, and to impose upon the schools the duty of repaying money out of funds that might be appropriated to the purposes for which the

loaned money was intended to be used. So construing the law, it was in this case in the power of the board of education to apply money collected and to be collected from the local tax levy made in 1924 for the purpose of maintaining the schools during the term commencing on September 1, 1924, to payment of debts for the loan of money for payment of teachers and support of the schools which had accumulated prior to the year 1924.

2. Another question is, did the board of education on March 13, 1925, have power to close the term which commenced September 1, 1924? In section 84 of the act of 1919 (Acts 1919, p. 288) it is provided: "The county boards of education shall have the power to define and regulate the length of the public-school terms of their respective counties. . . They shall, as far as practicable, provide the same facilities for both races in respect to attainments and abilities of teachers and for a minimum six months length of term time." This law confers upon the boards of education plenary power to provide for the duration of the terms of the public schools for periods of not less than six months. The board of education having the power to specify the terms of school as above indicated, such power will authorize them, after having specified a term exceeding six months, by subsequent resolution to close the term before the time specified in the first instance, provided the said time shall not make the term less than six months. Whether or not they will exercise such power is a matter of discretion to be governed by the facts of the particular case. In this case it appears that the schools were operated more than six months in the term which commenced in September, 1924. It was therefore within the power of the board of education to close the term at the time the resolution was passed for that purpose.

3. It was urged further by the plaintiffs that the board of education could not apply proceeds of the local tax levy for 1924 to payment of accumulated debts as referred to in the first division, or close the term of schools on March 13, 1925, as referred to in the second division, on account of an alleged contract between the board of education and the board of county commissioners, whose duty it was to levy the local tax, to the effect that if the board of county commissioners would levy a tax of three mills additional to the tax of five mills that had been levied in previous years, the board of education would conduct the schools for a full term of

nine months commencing September 1, 1924. The defendants' answer denied that any such contract had been made, and alleged that if made it would not have the effect of binding the board of education, because neither the board of county commissioners nor the board of education had power to make such contract. The evidence was conflicting as to whether there was any such agreement; but in making the tax levy of eight mills the board of county commissioners did not express that the schools would be operated for the full term of nine months. Assuming that the court was authorized to find that the board of education and board of county commissioners had entered into such a contract, the contract would not be binding or add anything to the law imposing duties or conferring powers upon the two boards. The whole power of the board of county commissioners was to levy the tax for school purposes. There is no provision of law authorizing them to do more than levy the tax. Therefore the so-called contract was lacking in the essentials of having two parties able to contract, and in effect was no more than the equivalent of an ex parte resolution upon the part of the board of education, declaring an intention to apply the tax in a certain way and to conduct the schools for a certain period. Both of these matters were within the discretion of the board of education, as pointed out in the preceding divisions of this opinion, and subject to change or modification.

4. Having seen that the board of education acted within its power, it remains to be decided whether the board of education acted arbitrarily, and committed an abuse of discretion in seeking to apply the funds derived from the local tax levy of 1924 to the payment of the previously accumulated indebtedness to the Citizens Bank, and in closing the schools on March 13, 1925, being more than six months but less than nine months from the beginning of the term commencing in September, 1924. It indisputably appeared from all the evidence that a large indebtedness to the Citizens Bank of Forsyth had accumulated, that there was a large interest account, and that the bank would not continue advancing to the board of education without reduction of the debt. The board of education deemed it necessary to reduce the debts, and, in order to do so, it was necessary to close the schools at the time above indicated and employ the money that would be required to operate the schools for a longer time towards payment of the debt. There does not

appear to have been any other reason or motive prompting the board of education to close the schools. In the circumstances it can not be said that there was any abuse of discretion. It is a dangerous practice for a board of education to accumulate large debts; and where it happens that they are accumulated for the purpose of paying teachers and operating the schools, a wise discretion will prompt their payment; and to that end it is not an abuse of discretion, when necessary to do so, to shorten the terms and apply the revenues of the board to payment of the debt. What has been stated is not altered by the fact that the board of education obtained money from the State with which to pay teachers in 1925, on the representation that it had made arrangements to conduct the schools for at least five months during the year 1925. No question was involved as to the State's right to proceed if the county board of education was not entitled to the allotments from the State school fund.

5. The foregoing rulings deal with the controlling questions in the case; and it follows that the judge erred in making the mandamus absolute.

*Judgment reversed. All the Justices concur, except Russell, C. J., and Hines, J., dissenting, and Beck, P. J., disqualified.*

GILBERT, J., concurring. Assuming that the debt was lawfully incurred, which assumption is authorized by the pleadings, and having in mind that we must take the case as made in the trial court, and that this is a court solely for the correction of errors, I concur in the judgment of reversal, for the reason stated by Justice Atkinson.

HINES, J., dissenting. 1. The decision of this case involves the power of county boards of education to borrow money, and to apply the public-school funds of the counties to the payment of debts contracted by such boards. For a number of years the Board of Education of Monroe County contracted each year, with the Citizens Bank of Forsyth, debts in excess of the annual school revenues of the county. They ran behind for a period of from twelve to eighteen months, and would each year borrow money with which to operate the schools. After applying all annual school funds of this county to the payment of these debts, the balances were carried forward to the succeeding years. As the years rolled by the balances increased. On April 8, 1924, this deficit

amounted to $69,017.93.   Thereafter the bank made further loans
to the county board of education.   On March 3, 1925, the in-
debtedness of the board to the bank amounted to $94,217.93. This
amount exceeded the total school revenues of the County of Mon-
roe for the year 1925.   On said date the board of education, by
resolution, transferred the entire school fund of the county to the
bank, including the balance due for 1925, and for any other year,
if necessary, to secure said sum.   In consequence of this last
transaction the county board of education stripped itself of all
means of operating the schools for the year 1925. The total school
revenue of that year would not pay the debt to the bank, to secure
which this transfer or assignment of the school fund of the county
was made to it.   So on March 13, 1925, the county board of edu-
cation passed a resolution closing the schools of the county.

In these circumstances, was the said indebtedness a valid and
enforceable debt against the school funds of the county for the
years 1924 and 1925, and was said assignment to the bank by the
board of the school funds coming to the county, both from the
State and local taxation, valid?   I do not think so.   The boards
of education of the several counties of this State are empowered
and authorized, whenever they deem it necessary, to borrow suf-
ficient amounts of money, and no more, to pay for the operation
of the public schools of their county; but no board of education
has authority to borrow sums of money greater in the aggregate
than the sum to which the county may be entitled from the pub-
lic-school fund.   Code of School Laws, § 95, Acts 1919, p. 328.
When any money is borrowed under the above section of the Code
of School Laws, the same shall be paid over to the county school
superintendent, and become a part of the public-school fund of
said county, and shall be by said officer paid out to the teachers
of the county schools.   Code of School Laws, § 101, Acts 1919,
p. 329.   By the above provision of our law the amount which can
be borrowed by a county board of education is fixed and limited.
The amounts which can be borrowed can not be greater in the
aggregate than the sum which the county is entitled to receive
from the public-school fund for a given year.   This provision of
the statute imposes a limitation upon the power of county boards
of education to borrow money.   The aggregate sum which can be
borrowed is stated and fixed.   The county board of education can

not exceed this limit. The clear import of these provisions of our school laws is, that the county board of education could borrow no greater sum of money in the aggregate than the amount of money which the county was entitled to receive from the public-school fund. The county board of education had no authority to create any debt against the county or the public-school fund in excess of this fund. In the case of *Appling* v. *Abbeville,* 136 *Ga.* 772 (72 S. E. 31), this court said: "The act approved December 3, 1895 (Acts 1895, p. 117), provided for the establishment of a system of public schools for the City of Abbeville under the supervision of a board of education, consisting of five citizens elected by the mayor and council. The board of education was authorized to employ teachers and fix their compensation. The mayor and council were empowered to annually levy and collect such tax (not to exceed one half of one per cent.) as would be sufficient, when added to the sums received from the public-school fund of the State, to support and maintain the city schools for at least six scholastic months in each year, and they were directed to pay the fund raised by the tax to the board of education, to be disbursed by the board for the support and maintenance of the schools. The clear import of the act was that the expenses of maintaining the city schools were to be defrayed exclusively from a fund produced by revenue from two sources, viz., that accruing from the town's levy of a special tax, and the town's proportionate part of the State public-school fund. The board of education had no authority to create any debt against the city. Their power to contract carried with it the limitation that the liabilities which they might create were payable only from the funds appropriated to the support of the schools."

Now what is the consequence if a county board of education exceeds this limit and borrows money in excess thereof? If a debt is contracted in excess of this limit, is it collectible? Section 102 of the Code of School Laws is as follows: "It shall be unlawful for any board of education to make any contract involving the expenditure of funds in excess of the total appropriation for the current fiscal year. Any indebtedness created, contract made, or order or draft issued in violation thereof [hereof?] shall be void." Here the statute plainly and distinctly declares the result which must follow if a county board of education borrows money in excess of

the limit fixed in § 95 of the Code of School Laws. Any indebtedness thus created, any contract thus made, any order or draft thus issued shall be void. The provision in § 97 of the Code of School Laws (Acts 1919, p. 328), that money borrowed "shall be paid back out of any funds coming into the hands of the county school superintendent that can be legally applied to the payment of the same," applies only to debts which are legally and lawfully contracted, and the aggregate of which is not greater than the public-school fund of the county. So it seems clear and indisputable that under the plain and unambiguous language of our statute this indebtedness to this bank, and the transfer and assignment by the board of all the school funds of the county for the years 1924 and 1925, and for any other year if necessary, to pay this indebtedness, are void and unenforceable against the school revenues of this county for the years 1924 and 1925.

The powers of public officers in this State are defined by law. Persons dealing with them must take notice thereof. The public can not be estopped by the acts of officers done in the exercise of a power not conferred on them by law. Civil Code (1910), § 303. Public officers have only such powers as are granted them. They take nothing by implication. The law granting these powers must be strictly construed. Persons dealing with them must at their peril ascertain the extent of their powers. *Decatur County* v. *Roberts,* 159 *Ga.* 528 (126 S. E. 460) ; *Baggerly* v. *Bainbridge State Bank,* 160 *Ga.* 556, 561 (128 S. E. 766). Besides, in this case, the bank had full knowledge of all the facts. Knowing these facts, it will be presumed that it knew the law applicable thereto.

2. The trial judge held that the public-school funds of the County of Monroe for the years 1924 and 1925, arising from that portion of the State public-school fund allotted to that county for the year 1924, and to arise from that portion of said fund to be allotted to the county for 1925, and from levies of local taxes in that county in 1924 for its public schools, could not be used, under the facts of this case, to discharge accumulated debts contracted by the county board of education prior to 1924, and that the assignment of said funds by the board to the Citizens Bank to secure the payment of such past-due indebtedness was null and void. .It is upon this ruling that the judgment of the court below is mainly based. Is that ruling correct? We will deal first with the State

public-school fund allotted to the county for these years. By the general appropriation act of August 20, 1923, the sum of $4,250,-000 was appropriated by the State "for the support and maintenance of the common or public schools of the State for each of the years 1924 and 1925." Acts 1923, pp. 13, 16. By the act of August 18, 1924, the State superintendent of schools is authorized to transmit $500 annually towards the support of a consolidated school with at least four teachers, where the county authorities combine smaller schools into a consolidated school; and in case the local school authorities provide for a standard four-year high school, $1,000 in addition is to be given from the State public-school funds to the local school authorities for the support of said school. These funds are given to aid the local authorities in payment of the salaries of the principal, and at least one assistant high school teacher. Acts 1924, p. 176. By section 94 of the Code of School Laws, the county superintendent in each county is required, under the approval of the county board of education, on the first day of each month to transmit to the State school superintendent an itemized statement of the various sums due and unpaid by the county board of education on the first of each month, "for teachers' salaries, for pay of the county school superintendent, or for any other item of expense properly charged under the law to the county board of education;" and when said itemized statement has been approved by the State school superintendent and presented to the Governor, the latter shall issue his warrant upon the treasurer for all the funds standing to the credit of each of the several counties upon the books of the treasurer, or for such part thereof as may be needed to liquidate the indebtedness of the county board of education of such county, as shown by such statement. Upon presentation of the warrants aforesaid, the treasurer is required to draw his checks for the amount of said warrants, in favor of the county school superintendent of the county, and the State school superintendent is required to immediately transmit said checks to the county school superintendents of the respective counties, "who shall promptly disburse the money so received in payment of the sums set out in the itemized statement aforesaid; and if the money is not sufficient to pay said sums in full, then it shall be prorated among the various items, provided that the expenses of administration for each month shall first be paid in full."

The county board of education is authorized by this act to make their contracts in such manner that the amounts payable to teachers for services rendered shall become due and payable monthly. Acts 1919, p. 327. The meaning of this section is clear. "The expense of administration for each month shall first be paid in full." "The amounts payable to teachers for services rendered shall become due and payable monthly." The money coming to a county from its allotment of the public-school funds can only be drawn from the State treasury under an appropriation made by the legislature, and upon a warrant or warrants drawn by the Governor. The only appropriation acts by which this fund can be drawn from the State treasury and turned over to the County of Monroe are the two acts of 1923 and 1924 above referred to. By the first of these acts the legislature has made an appropriation of the State school fund solely "for the support and maintenance of the common or public schools of the State for each of the years 1924 and 1925." The legislature has made no appropriation of the public-school funds for the payment of past-due, accumulated debts made by the county board of education. It certainly has made no appropriation of public funds for the payment of debts illegally contracted by a county board of education. By section 94 of the Code of School Laws it is expressly provided that the expenses of administration of the public schools of the county, including the pay of teachers, shall be first paid in full out of the funds received from the State. Under these laws, these funds can not be used by the county board of education to pay even legal debts contracted by the county board of education, until the current monthly expenses of conducting the public schools have been paid in full. The contention that these funds can be used to pay past-due indebtedness is right in the teeth of these statutes. It never was the intention of the legislature that county boards of education could contract debts, in excess of the annual revenue applicable to the operation of the public schools, and then shut down the schools until the revenues derived from the State and from local taxation had wiped out said accumulated debts. The whole theory of the system is that the expenses of conducting the schools shall be paid monthly, and in preference to other legal debts due by the county boards of education. Undoubtedly, then, the trial judge was authorized to hold that the funds coming to

this county from the public-school funds of the State, for the support of public schools within its borders, ought first to be applied to the current expenses of operating the schools before past-due, accumulated debts made by the county board were paid; and especially was this true where such debts were illegally contracted.

We come next to consider the question whether the school funds of this county, arising from local taxation in 1924, could be legally applied to the payment of this accumulated indebtedness of the county board of education. On September 16, 1924, the county commissioners, upon the recommendation of the board of education, levied a special tax of five mills "for educational purposes, and the support of the public schools of Monroe County," and upon the further recommendation of the county board of education levied an additional three mills "for educational purposes, to insure payment of teachers' salaries for a full nine-months term throughout the county." Before the passage by the county commissioners of the resolution levying said tax, the county board of education requested the commissioners to levy a tax of three mills for the purpose of paying past-accumulated debts of the county board of education. This the county commissioners declined to do; but agreed to levy an additional tax of three mills for school purposes, if the county board would continue for the regular nine-months term the public schools of the county which had been, and were still being, conducted. Thereupon the county board of education unanimously passed a resolution agreeing that the money arising from this levy of three mills should be used to continue the public schools of the county for the regular term of nine months, which had previously been fixed by the board and was then in existence. Upon this resolution of the county board the county commissioners made said tax levy of three mills. Thereupon the county board of education notified the State school superintendent that arrangements had been made for continuing the common schools of Monroe County for at least six months in the year 1925. Under these facts, could the county board of education divert the funds arising from these local tax levies, and especially the funds arising from the special levy of three mills, from the payment of the expenses of operating the public schools of the county for the school year of 1924-1925?

By the constitution of this State, "Authority is granted to the

counties, . . upon the recommendation of the corporate authority, to establish and maintain public schools in their respective limits by local taxation;" and provision is made for the levy of taxes for that purpose. Acts 1919, p. 66; *Smith v. Tolbert,* 160 *Ga.* 268 (127 S. E. 868). County taxes shall be assessed "to pay charges for educational purposes, to be levied only in strict compliance with the law." Civil Code (1910), § 513, par. 8. Levy of the county tax, including this educational tax, must be done by order of the county authorities authorized to levy the county tax, and must be entered on their minutes. This order must specify the per cent. levied for each specific purpose. Civil Code (1910), § 514. Taxes levied for educational purposes must be used for such purpose, and none other. Civil Code (1910), § 516. Under the order of the county commissioners levying the county tax for 1924, there was levied a county-wide tax of eight mills, for the purpose of maintaining schools "for nine months, throughout the County of Monroe." The specific purpose of the levy of this educational tax was for maintaining the public schools of Monroe County for nine months. The levy was made on September 16, 1924. By resolution of the county board of education, the school year ran from September 1 to September 1. This tax was levied for the specific purpose of maintaining a nine-months school during this school year. It was not levied for the purpose of paying past-due debts of the county board of education. The tax not being levied for the purpose of paying these past-due debts, but levied for the specific purpose of maintaining the public schools for nine months, the proceeds arising from such tax could not be applied to the payment of any such past-due indebtedness, until the expense of operating the schools for nine months had been paid. Our law on this subject expressly declares that the proceeds of a tax levied for one purpose can not be applied to any other purpose. The county commissioners, under the amendment to the constitution of November 2, 1920, had authority "to assess and collect taxes for the support of public schools" in that county. The proceeds of such tax, under this constitutional provision, are to "be distributed equitably, according to the school population, tax values, the number of teachers and the grade of license, among the public schools" of the county. This tax levy was made under this constitutional provision. The proceeds of such tax are for the sup-

port of the public schools of the county. Its proceeds are to be distributed among the schools of the county under the plan specified in this amendment to our constitution. If the proceeds of such tax are diverted to the payment of past-due debts contracted by the county board of education, they would not be used for the support of the public schools during the school year of 1924-1925. Furthermore the proceeds of such tax, in that event, would not be distributed among the public schools of the county as required by this constitutional provision.

In *Baggerly* v. *Bainbridge State Bank*, supra, we held that the judge of the superior court was without authority to authorize the treasurer of a school district to expend the funds of such district, "which arose during the year 1924, to the payment of the expenses of this school for the year 1925," but that the revenues of the first-named year should go to discharge the expenses of operating the school of the district for that year. It seems to be clear that under the constitution and laws of this State the public-school fund of a county for a given year shall first be used for the payment of the expenses of operating the schools during such year. It follows that the trial judge properly held that the public-school fund of the County of Monroe, coming from the State and arising from the local school tax levies for the support of the public schools of that county for the school year 1924-1925, could not, under the law and under the resolution of the county commissioners making such levies, be diverted from the payment of the expenses of operating the schools in that county for that year, and applied to the payment of past-due debts contracted by the county board of education and remaining unpaid.

3. Did the county board of education abuse its discretion in closing the public schools of this county on March 13, 1925, under the facts disclosed in the record? The board had previously fixed the school term for 1924-1925 for a period of nine months. It had represented, and the representation was true, that it had made arrangements for the operation of the public schools in the county for at least six months during the year 1925; and on the faith of this representation the State school superintendent had allotted to that county its portion of the State public-school fund for the year 1925. Furthermore, this board had recommended to the county commissioners the levy of a tax of eight mills for the

operation of these schools during the school year 1924-1925, for a period of nine months; and upon its representation the county commissioners by resolution levied such tax for the express and specific purpose of operating these schools during this school year of nine months. The balance of the county school fund on March 13, 1925, thus applicable to the expenses of operating these schools for such term, was ample to defray the expenses of their operation for the remainder of the school year of 1924-1925, if so applied, and if not applied to the payment of the past-due debts of the county board of education. The county board of education closed down the schools on the above date, after their operation for six months, in order that this balance of the school funds of the county might be applied to the discharge of its indebtedness to the Citizens Bank. In these circumstances, was the board authorized to close down these schools? Section 84 of the act of 1919 (Acts 1919, p. 288) is in part as follows: "County boards of education shall have the power to define and regulate the length of the public-school terms of their respective counties." Under this provision of law these boards have the power to define and regulate the length of the public-school terms of their respective counties. They have in this respect a wide discretion. It is true that "Ordinarily the writ of mandamus is a remedy for official inaction. It does not lie to control the conduct of an officer vested with a discretion, except where the exercise of that discretion has been so capricious or arbitrary as to amount to a gross abuse." *City of Atlanta* v. *Wright,* 119 *Ga.* 207 (45 S. E. 994). However, "All official duties should be faithfully fulfilled; and whenever, from any cause, a defect of legal justice would ensue from a failure or improper fulfillment, the writ of mandamus may issue to compel a due performance, if there be no other specific legal remedy for the legal rights." Civil Code (1910), § 5440. The county board of education had fixed a term of nine months for the school year 1924-1925; and having procured sufficient funds expressly provided for that purpose, to operate these schools for such term, and there being on hand a balance of such funds more than sufficient to carry out this purpose, it became the legal duty of the board to operate said schools for said term. The law, as well as good morals, required them to discharge this legal duty. The trial judge properly granted a mandamus requiring them to

discharge this duty by operating said schools for the term of nine months, and applying these funds to defray the expenses of their operation.

4. But it is insisted by the plaintiffs in error that the Board of Commissioners of Monroe County, and the board of education of that county, could not enter into an agreement to operate the schools for any particular time, and that the board of education is not bound by any such agreement or any promise to the board of county commissioners with reference to the length of time the county board of education would operate the public schools. It may be conceded that these bodies were without authority to enter into any such agreement, and that the board of education would not be legally bound to observe such agreement or to comply with any promise which it made to the board of commissioners with respect to the length of the term for the operation of the schools of the county. But, independently of any such agreement or any such promise, the county board of education having recommended the levy of a tax for the purpose of conducting the public schools for a given term, and in pursuance of such recommendation the tax having been levied for this purpose, which produced sufficient funds to effect it, the board of education was in legal duty bound to operate the schools for that term. It would not be relieved from the discharge of this duty by reason of the fact that the tax for such purpose was levied by reason of the existence of such agreement and of such promise. The duty to operate these schools did not arise from such agreement and promise. It arose from the duty imposed by law upon the county board of education to operate these schools, under the facts in this case.

5. For the above reasons, I think the judgment of the court below should be affirmed; and I feel compelled to dissent from the opinion of the majority. I am authorized to say that Chief Justice Russell concurs in this dissent.